**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1673**

_____

BYRON MATTHEW JOHNSON,

Plaintiff - Appellant,

v.

ELDOR AUTOMOTIVE POWERTRAIN USA, LLC,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Michael F. Urbanski, Senior District Judge.  (7:20-cv-00642-MFU)

_____

Argued:  September 26, 2024                 Decided:  November 26, 2024

_____

Before THACKER, RICHARDSON, and BENJAMIN, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:**  Thomas Eugene Strelka, VIRGINIA EMPLOYMENT LAW, Roanoke, Virginia, for Appellant.  Elaine Duross McCafferty, WOODS ROGERS VANDEVENTER BLACK, PLC, Roanoke, Virginia, for Appellee.  **ON BRIEF:**  Thomas M. Winn, Leah M. Stiegler, WOODS ROGERS VANDEVENTER BLACK, PLC, Roanoke, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises from the firing of Byron Matthew Johnson ("Appellant"), an engineering and maintenance manager at an automotive parts manufacturing plant in Daleville, Virginia. Appellant alleges that he was fired in retaliation for intra-company complaints regarding his supervisees' right to overtime pay pursuant to the Fair Labor Standards Act ("FLSA"). Appellant's employer, Eldor Automotive Powertrain USA, LLC ("Appellee"), alleges that Appellant's complaints failed to provide reasonable notice of a potential FLSA violation.

The district court granted Appellee's motion for summary judgment. We affirm because Appellant has failed to establish a prima facie case of retaliation.

I.

A.

Appellee hired Appellant in 2017 to oversee the set up of an assembly line at its new plant in Daleville, Virginia (the "Daleville Plant"). Appellant hired six team members to assist him with setting up the assembly line at the plant and running it after it was installed. As Appellant admitted in his deposition, those employees were hired into positions that were exempt from any overtime pay requirements pursuant to the FLSA for working more than 40 hours per week.

Production was scheduled to begin at the Daleville Plant in October 2018. Senior management acknowledged that the lead up to the Daleville Plant opening and the months after were filled with long hours, late nights, and weekend work. Amidst these demands, Appellant began to butt heads with his supervisors.

2

In July 2018, Appellant yelled at Bridgett Farmer, the human resources manager for the Daleville Plant, on the plant floor in front of technicians and process engineers: "we don't have enough manpower!"  J.A 89 ¶ 14.[1]  Farmer and Fabio Piscone, the Daleville Plant Manager, verbally counseled Appellant that this was inappropriate behavior for a manager because it could create distrust in Appellee's management and processes. Appellant alleges that he did not raise his voice.

In September 2018, Farmer instructed Appellant to tell one of his supervisees to stop using a parking spot that was reserved for management.  But Appellant refused to do so, arguing that human resources had mistakenly given the spot to the employee.  Appellee asserts that Appellant later admitted that he had told the employee to park there and felt uncomfortable telling him otherwise.

Then, on October 27, 2018, one of Appellant's supervisees, Ben Wilkerson, bypassed Appellant and Piscone and directly emailed Giovanni Scafidi, the Chief Operating Officer of Appellee's parent company.  Wilkerson copied Appellant on this email.  In his email, Wilkerson complained that the Daleville Plant was "extremely understaffed" and that his team was "about to break."  J.A. 185.  Scafidi responded to Wilkerson and acknowledged that the Daleville Plant was understaffed.  Scafidi explained that, as had been the case in the other countries where their company had opened plants, getting Appellee's operation up and running would take a lot of "effort" and "sacrifice." *Id.*  Scafidi further explained that after the "strong and big effort [of] the first year," the

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

work would even out to "a standard effort and a lot of satisfaction for the result reached." *Id.* In reply, Wilkerson reiterated his concerns about staffing and emphasized that "the people do not trust management." *Id.* at 184.

On October 30, 2018, Scafidi forwarded the email he received from Wilkerson to Piscone, Farmer, and Appellant, as well as the other Daleville Plant managers. In that email, Scafidi again recognized that the Daleville Plant was understaffed and asked for input on how the team could better handle the stress of getting the plant up and running. Piscone and Farmer told Appellant that he needed to speak with Wilkerson because Wilkerson was "complaining about a lot of the issues [Piscone and Farmer] were trying to address with [Appellant]." J.A. 92. They told Appellant that he needed to explain to Wilkerson that Appellee was working to improve the staffing conditions at the plant, and that Wilkerson had to "be positive and stay focused on the activity . . . [without] losing time on [the] kind of email [he sent to Scafidi]." *Id.* at 1031. Piscone and Farmer also emphasized that Appellant was to direct Wilkerson "to follow the chain of command." *Id.* Wilkerson's supervisor was Appellant, and so Wilkerson was expected to reach out to Appellant about any complaints.

During the time period between Wilkerson's initial email to Scafidi and Appellant's ultimate firing, Appellant asserts that he made three separate intra-company complaints regarding the employees' alleged entitlement to overtime pay pursuant to the FLSA.

Appellant alleges that he made his first complaint in November 2018, during a meeting with Piscone and Farmer. According to his deposition, he informed them: "I'd found the legality in Virginia being you can't work a non-engineer [] over 40 hours without

4

some kind of compensation." J.A. 411. Appellant says he proposed "three options" to compensate employees working over 40 hours: (i) employees would get paid time and a half after working more than 50–60 hours; (ii) employees who worked more than 50–55 hours would have time added to a "flex time bank"; and (iii) late-night call ins would be credited a minimum of four hours. *Id.* at 412. Appellant admitted that none of his proposed solutions would kick in at the 40-hour mark, only at the 50–60 hour mark. *Id.* ("[T]here was like combinations of options, but none of them hit at 40 or after 40."). In their respective declarations, both Piscone and Farmer denied that Appellant ever reported that Appellee was working employees illegally, violating the FLSA, or not paying employees required overtime under federal or state law.

Second, Appellant alleges that he made another oral complaint in November 2018, when Scafidi was visiting the Daleville Plant. Appellant claims that he met with Scafidi and Piscone and reiterated that Appellee "needed to comply with Virginia law with the overtime." J.A. 433–34. He contends that he proposed the same solutions that he had previously presented to Piscone and Farmer. In his own deposition, Scafidi denied that Appellant ever reported issues about employees not receiving overtime compensation.

Finally, on December 11, 2018, Appellant emailed Scafidi directly, without copying Piscone or Farmer, to ask for relief for his workers. In his email, he stated that his supervisees were asked to "work many [hours] of overtime without a hint of compensation." J.A. 190. He asked Scafidi to consider the "compensations idea [he] [had] proposed" or "bonuses . . . for working overtime." *Id.*

5

At oral argument, Appellant's counsel conceded that none of Appellant's complaints referenced the FLSA. Oral Argument at 44:02–44:24, *Johnson v. Eldor Automotive Powertrain, LLC*, No. 23-1673 (4th Cir. Sept. 26, 2024), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments ("Q: Did Appellant ever specifically invoke the FLSA to Apellee? . . . A: The Appellant never used the letters FLSA in raising any issue.").

Beginning in November 2018, Piscone and Farmer began having weekly action meetings with Appellant to discuss his management deliverables and areas for improvement. After failing to see an improvement, and due to concerns about losing staff, on December 10, 2018, they created a Performance Improvement Plan ("PIP") for Appellant that gave him 60 days to correct course. On December 12, 2018, Piscone and Farmer met with Appellant to discuss their concerns and present him with the PIP. They informed him that, pursuant to the PIP, he would be fired if his performance did not improve. Appellant signed the PIP. He later said he did so because he was concerned about losing his job.

That same day, Wilkerson emailed Scafidi again, copying Appellant, Piscone, and Farmer. The subject line of Wilkerson's email was "What else can i do?" (sic). J.A. 192. In the body of the email, Wilkerson complained about being overworked and asked to stay late without any explanation. He stated that Appellant, who was his supervisor, "did not know" why he was being asked to do extra work. *Id.*

On December 13, 2018, Scafidi responded to Appellant's December 11 email. Scafidi emphasized Wilkerson's frustrations and told Appellant that he needed to improve

his communication skills and manage his team more effectively. In reply, Appellant apologized for Wilkerson's email and agreed that he needed to improve his management skills.

Later that day, Piscone and Farmer met with Appellant to discuss the Wilkerson email. Appellee alleges that Appellant admitted that he had not met with Wilkerson as he had been directed to do nearly six weeks prior. Further, Appellant refused to answer when Farmer asked him whether he had helped Wilkerson write the emails he sent to Scafidi. Piscone and Farmer believed this warranted cause and consequently terminated Appellant's employment.

After he was fired, Appellant memorialized his account of the events. In that document, Appellant wrote that he proposed providing additional compensation for staff working more than 60 hours. He did not make note of any legal obligations regarding overtime or the FLSA.

B.

Appellant sued Appellee in the Western District of Virginia, alleging: (i) Title VII claims for discrimination based on national origin and retaliation; (ii) breach of contract; and (iii) retaliation pursuant to the FLSA. Appellee moved for summary judgment and Appellant abandoned his Title VII claims. The district court denied Appellee summary judgment on Appellant's breach of contract claim and granted summary judgment with respect to Appellant's FLSA retaliation claim. The parties subsequently settled the breach of contract claim and the district court entered an order of dismissal of that claim. This appeal, which relates only to the FLSA retaliation claim, followed.

7

II.

We review the district court's summary judgment ruling de novo, applying the same legal standards as that court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1036 (4th Cir. 2020). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a non-movant must point to "evidence on which the jury could reasonably find for" him. *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 572 (4th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

III.

The anti-retaliation provision of the FLSA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against [an] employee because such employee has filed [a] complaint or instituted . . . any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). A plaintiff asserting a prima facie claim of retaliation under the FLSA must prove: (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action. *Wai Man Tom*, 980 F.3d at 1042 (citing *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008)).

8

Filing an intra-company complaint alleging an FLSA violation is a protected activity. *See Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 438 (4th Cir. 2012). This protection applies equally to written and oral complaints. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011) (holding that oral complaints may "fall within the scope of the phrase 'filed any complaint' in the [FLSA]'s antiretaliation provision."). Whether oral or written, however, the employee's complaint must provide the employer with "fair notice that a grievance has been lodged" pursuant to the FLSA. *Id.* at 14.

An employee's intra-company complaint provides fair notice when it is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Minor*, 669 F.3d at 439 (quoting *Kasten*, 563 U.S. at 14). Some degree of formality is required, "certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand that matter as part of its business concerns." *Id.* Simply "letting off steam" will not suffice to invoke the protections of the statute. *Id.* (citing *Kasten*, 563 U.S. at 13–14).

Appellant relies on three intra-company complaints to establish the first prong of his prima facie case of retaliation: (i) his oral complaint to Piscone and Farmer; (ii) his oral complaint to Scafidi and Piscone; and (iii) his written email to Scafidi. However, none of these complaints were sufficient to give reasonable notice to Appellee that Appellant was asserting a violation of the FLSA.

As Appellant concedes, none of his complaints specified that Appellee was violating its FLSA obligations.  Rather, Appellant only referenced an obligation under Virginia law to pay non-engineers an overtime rate for working more than forty hours a week.[2]  While Appellant was not required to specify that Appellee was violating a particular provision of the FLSA, or even mention the FLSA at all, this fact must still be read in the broader context within which Appellant made his complaints.  In that context, Appellant -- and by extension, Appellee -- knew that the employees he supervised were exempt from the FLSA.  Thus, Appellee would not have reasonably interpreted Appellant's assertion about a state law obligation as a reference to an FLSA obligation, given that both Appellee and Appellant knew that the employees in question were not subject to the FLSA.

In addition, Appellant repeatedly emphasized that none of the solutions he proposed for the alleged overtime issue kicked in at the 40-hour mark.  Instead, Appellant himself noted that his proposals would apply after an employee had worked for 50 or 60 hours.  Again, a reasonable employer is unlikely to read an FLSA violation into a complaint that proposes these solutions because, crucially, they would not resolve the alleged FLSA violation.  That is, an employer that pays employees for overtime once they have worked more than 50 hours in a week is still in violation of its obligation to pay overtime to employees after 40 hours per week.  An employer reviewing a complaint that proposes this

---

[2] The FLSA requires that non-exempt employees who work in excess of 40 hours in a week are compensated at not less than one and one-half times their regular rate of compensation.  *See* 29 U.S.C.A. § 207 (a)(1).

10

solution could not reasonably think that the complainant is alleging a violation of a legal obligation that kicks in at 40 hours of work per week.

Together, these facts mean that Appellee could not have been given fair notice that Appellant was asserting an FLSA grievance, thereby warranting summary judgment dismissal of Appellant's claim. No further analysis is necessary.[3]

IV.

For the foregoing reasons, the district court's order granting Appellee summary judgment is

*AFFIRMED*.

---

[3] The district court applied the "manager's rule" as an alternative basis to dismiss Appellant's claim. That rule has never been adopted by this Circuit in the FLSA context and the Court can see no need to examine its applicability today or assess how it has been affected by *Kasten*. *See, e.g.*, *Rosenfield v. GlobalTranz Enters., Inc.*, 811 F.3d 282 (9th Cir. 2015).

11