In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1671

KEVIN KASTEN,

*Plaintiff-Appellant,*

*v.*

SAINT-GOBAIN PERFORMANCE
PLASTICS CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 C 0686—**Barbara B. Crabb**, *Judge*.

ARGUED OCTOBER 30, 2012—DECIDED NOVEMBER 30, 2012

Before BAUER, FLAUM, and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge*. Kevin Kasten sued his employer, Saint-Gobain Performance Plastics Corporation ("Saint-Gobain"), alleging unlawful retaliation for lodging oral complaints regarding the location of time clocks under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 215(a)(3). Kasten complained that Saint-Gobain's time clocks were placed in locations which caused him to

frequently forget to punch in, notifying his supervisors on at least five occasions that the location away from the donning and doffing area was "illegal." Kasten failed to punch in on several occasions, violating company policy. He was suspended and ultimately terminated. The district court granted summary judgment for Saint-Gobain on the ground that oral complaints do not constitute protected activity under the FLSA, and we affirmed the decision. On certiorari, the Supreme Court vacated and remanded our decision, holding that oral complaints may qualify as protected activity where they provide "fair notice" that an employee is asserting his rights under the FLSA. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334 (2011). On remand, the district court concluded that Kasten's oral complaints did in fact provide Saint-Gobain with "fair notice" that he was asserting rights under the FLSA, but concluded that Kasten had failed to create a dispute of material fact regarding causation. Accordingly, the court granted summary judgment in Saint-Gobain's favor. Because Kasten has provided evidence which would support a jury inference of retaliation, we reverse the district court's grant of summary judgment in Saint-Gobain's favor and remand for further proceedings.

## I. Background

### A. Factual Background

Saint-Gobain manufactures a variety of high performance polymer products. Kasten worked for Saint-Gobain at its Portage, Wisconsin manufacturing and

production facility from October 2003 through December 2006. Kasten held multiple positions as an hourly manufacturing and production employee.

Saint-Gobain requires employees like Kasten to punch in and out of its time clocks to receive a weekly paycheck. The Saint-Gobain employee policy handbook explains the existence of a "Corrective Action Program" that provides for disciplinary action up to and including termination for employees who fail to punch in and out correctly. The program's procedures typically begin with a verbal reminder, progress to written warnings, and conclude with termination. Under the Corrective Action Program, an employee can be terminated after receiving four disciplinary actions within a twelve-month period.

In addition, Saint-Gobain's handbook outlines a distinct "Attendance Policy" applicable to unexcused absences and tardiness. If an employee punches in late because he arrived at work late, that employee would have violated the Attendance Policy. However, if the employee arrived at work on time and simply forgot to punch in, that employee would have violated the time clock policy and would be subject to the Corrective Action Program. Under the Attendance Policy, an employee receives a point for every two violations. If an employee receives seven points under the Attendance Policy within a twelve-month period, he could be terminated according to that policy.

During Kasten's 39 months of employment, he received the following overall ratings on his performance appraisals: "Very Good" on March 19, 2003; "Good" on

May 5, 2003; "Good" on December 8, 2003; "Good" on May 3, 2004; and "Good" on March 30, 2005. However, Saint-Gobain also formally disciplined Kasten on eleven occasions for violations of its employee policies. On December 30, 2003, February 13, 2004, and January 20, 2006, Saint-Gobain issued Kasten disciplinary action warning notices for Attendance Policy violations. On April 5, 2004, June 1, 2004, September 28, 2006, and October 31, 2006, Saint-Gobain issued him disciplinary action warning notices for violations of its safety and accountability policies.

On February 13, 2006, Kasten received a "disciplinary action warning notice—verbal counseling warning" from Saint-Gobain because of several "issues" relating to punching in and out on the time clocks during January 2006. This notice stated that "[i]f the same or any other violation occurs in the subsequent 12-month period from this date of verbal reminder, a written warning may be issued." On August 31, 2006, Kasten received a "disciplinary action warning notice—step 2 policy violation—written warning" from Saint-Gobain, again regarding problems punching in and out on the time clocks. The notice stated in part that "[i]f the same or any other violation occurs in the subsequent 12-month period from this date [it] will result in further disciplinary action up to and including termination."

The parties dispute whether Kasten told his supervisors that the location of Saint-Gobain's time clocks was illegal after he received these two disciplinary warnings. Kasten alleges that he complained multiple times

that the location of the clocks was illegal, causing him to miss punches. Specifically, he alleges that in September or October 2006, he told his Shift Supervisor, Dennis Woolverton, that he believed the time clock location was illegal. He also alleges that on three or four occasions between September and December 2006 he told third Shift Lead Operator April Luther about his belief that the time clock location was illegal and that he was considering starting a lawsuit about it. Saint-Gobain alleges that Kasten's complaints instead focused on the inconvenience of the time clock location.

Management at Saint-Gobain had internal discussions regarding the legality of the time clock location. On September 29, 2006, Human Resources Manager Dennis Brown emailed Plant Manager Daniel Tolles, Human Resources Generalist Lani Williams, and Plant Engineer Lance DeLaney regarding the time clocks. Brown wrote in part:

> [a]s you know we need to move our Kronos clocks to ensure that we are in compliance with Wage and Hour law which states that employees are to be paid for the time used to gown/prepare for work. Lani and I walked out to review our current set-up and to determine what we should do to become compliant.

On November 10, 2006, Kasten received a "disciplinary action warning notice—step 3 policy violation—written warning" and a one-day disciplinary suspension for his failure to clock in and out on the time clocks on October 31, 2006. The notice stated in part that "if the same or any other violation occurs in the subsequent 12-

month period from this date [it] will result in further disciplinary action up to and including termination." Kasten served his one-day suspension on November 16, 2006. On (or around) November 18, 2006, Kasten forgot to punch in after returning from lunch. Soon after, Kasten asked Luther about having a potluck meal at work, stating that he was probably going to be fired over his most recent missed punch.

On December 6, 2006, Saint-Gobain suspended Kasten on the ground that he had violated the time clock punches policy a fourth time. Kasten alleges that before the meeting regarding his suspension, Woolverton stopped him and said, "just lay down and tell them what they want to hear, [they] can probably save your job." Saint-Gobain denies that Woolverton made such a statement. At the meeting, Kasten asked whether the location of the clocks was a "legal issue" for the company. Kasten alleges, and Saint-Gobain denies, that he told Brown and Operations Manager Steven Stanford that he believed the location of the time clocks was illegal and that Saint-Gobain would lose if it was challenged in court.

Kasten alleges that on December 8, 2006, he had a phone conversation with Williams in which he told her that he thought the location of the time clocks was illegal and that "if they were challenged in court, they would lose." That same day, Luther emailed Brown regarding the conversation, stating that "he made the comment to me that if he does get fired his name will be widely known as he has many things in the works."

On Saturday, December 9, 2006, Kasten called Shift Supervisor Mary Riley and asked whether she had read any articles about a class action lawsuit and time clock punches. Riley then emailed the Human Resources Manager and Human Resources Generalist the following:

> Kevin Kasten called me here at work today about 3:45 PM to ask me if I had read any articles here about a class action suit and punches. I told him I hadn't read anything here and said goodbye.

Kasten alleges that the Human Resources Manager forwarded this email to the Operations Manager and Plant Manager on Monday morning, December 11, 2006. Later that same day, Brown told Kasten over the phone that Saint-Gobain had decided to terminate his employment. Kasten alleges that the Operations Manager and Plant Manager participated in the decision to terminate his employment. Saint-Gobain's time clocks were also moved closer to the donning and doffing area on that same day.

When asked whether the conversation in which Saint-Gobain decided to terminate Kasten "involved the question Mr. Kasten asked about whether the location of the time clock was a legal issue," the Human Resources Manager acknowledged that "it's likely that it came up." Kasten further alleges that management personnel discussed Kasten's threat of a potential lawsuit related to the location of the time clocks. On December 19, 2006, Williams wrote Kasten a letter confirming his termination and explaining that the termination was in response to his repeated violation of the time clock policy.

Saint-Gobain has terminated several employees for violating its time clock policy. Kasten alleges that Saint-Gobain did not promptly terminate two employees that had more time clock violations than he did, namely, Shawn McCune and Joyce Montcufe. Saint-Gobain terminated Shawn McCune on January 15, 2007 for violating the time clock policy, after McCune had received discipline through Saint-Gobain's progressive discipline policy. Joyce Montcufel received three disciplinary warnings for missing punches under the same policy applicable to Kasten (the time clock policy changed in May 2007; Montcufel missed a number of punches after May 2007 and was disciplined according to the new policy).

On August 15, 2007, Kasten and others filed a class action lawsuit against Saint-Gobain for violations of the FLSA, including failure to pay hourly workers at the Portage, Wisconsin plant for time spent donning and doffing. On June 2, 2008, the Western District of Wisconsin District Court granted summary judgment to the class action plaintiffs, finding as a matter of law that Saint-Gobain had violated the FLSA. The lawsuit was subsequently settled on behalf of 156 opt-in collective class members and 768 Rule 23 class members.

On September 12, 2007, Kasten filed a wage and hour complaint against Saint-Gobain with the Equal Rights Division of the Wisconsin Department of Workforce Development, alleging that he had been wrongfully terminated. In response to Kasten's initial retaliation complaint, Saint-Gobain represented to the Department

of Workforce Development that Kasten was terminated because he violated the Attendance Policy. Specifically, in its position statement to the state, Saint-Gobain explained that "disciplinary actions for time clock violations, tardiness, and absenteeism are all governed by the attendance policy." Kasten pointed out in his rebuttal statement that his termination would be improper under the Attendance Policy, as he had not clocked in late twenty-five times within a twelve-month period (the required grounds for termination under that policy).[1] Saint-Gobain later described its aforementioned position as a labeling error, claiming that Kasten was terminated pursuant to the Corrective Action Program rather than the Attendance Policy. The Department issued a finding of "Probable Cause" that Saint-Gobain terminated Kasten in retaliation for his protected complaints.

## B. Procedural Background

On December 5, 2007, Kasten filed this civil action under the FLSA. He alleged that Saint-Gobain retaliated against him for lodging oral complaints of alleged FLSA violations by increasing the frequency and severity of

---

[1] Under the Attendance Policy, after the first ten tardies, an employee begins to accrue one-half point per tardy and could be terminated if the employee accrued seven points within a rolling twelve-month period. In addition, an employee arriving at seven points for the first time during their employment could receive one last chance prior to termination.

disciplinary action against him and by terminating his employment. On June 18, 2008, the district court granted Saint-Gobain's motion for summary judgment on the basis that oral complaints were not protected activity under the FLSA; the district court did not address Saint-Gobain's arguments regarding the sufficiency of causation evidence. On appeal, we affirmed the district court's decision that oral complaints do not constitute protected activity under the anti-retaliation provision of the FLSA. The Supreme Court granted certiorari and held that oral complaints are protected activity under the FLSA's anti-retaliation provision so long as they provide an employer "fair notice" that the employee is asserting rights under the FLSA. *Kasten,* 131 S. Ct. at 1334. The Court vacated the summary judgment order and remanded for further proceedings.

On remand, the district court determined that although Saint-Gobain had received "fair notice" that Kasten was asserting rights under the FLSA (such that his activity was protected) and Saint-Gobain had taken adverse employment actions against him, Kasten had failed to establish a genuine dispute of material fact regarding causation. Accordingly, he had not established a prima facie case of retaliation. On March 6, 2012, the district court entered summary judgment in Saint-Gobain's favor. Kasten filed a timely notice of appeal.

## II.  Discussion

Our review of the district court's grant of summary judgment is de novo. *Raymond v. Ameritech Corp.,* 442 F.3d

600, 608 (7th Cir. 2006). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are viewed in the light most favorable to the nonmovants, drawing all reasonable inferences in their favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). If a "reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### A. Kasten has raised a genuine dispute of material fact regarding causation

Under the FLSA, it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). Under § 215(a)(3), Kasten has the burden of demonstrating that Saint-Gobain engaged in retaliatory conduct, utilizing either the direct or indirect method of proof. *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005).

To establish a prima facie case of retaliation under the direct method, Kasten must show: (1) that he engaged in protected expression; (2) that he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). To show causation under the direct

method, Kasten may rely on either direct evidence of a causal link, or "circumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation." *Treadwell v. Office of Ill. Sec. of State*, 455 F.3d 778, 781 (7th Cir. 2006). In other words, Kasten must show "that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains" through the use of direct and/or circumstantial evidence. *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Direct evidence is evidence, which "if believed by the finder of fact, 'will prove the particular fact in question without reliance upon inference or presumption.'" *Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003) (internal citation omitted). Circumstantial evidence, which allows a jury to infer retaliation, may include: (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action. *See id.* at 689-90.

Kasten argues that under the direct method of proof he has adduced sufficient direct and circumstantial evidence to create a genuine dispute of material fact regarding causation. First, he identifies the fact that Saint-Gobain's Human Resources Manager admitted that decisionmakers "likely" discussed his protected complaints when deciding to terminate his employment. Second, he suggests that Kasten's Shift Supervisor forewarned him that Saint-Gobain would terminate his employment unless he would "tell them what they want to hear," which he interpreted as a threat that he would

be fired if he did not stop reporting violations of law. He also argues that the timing of the events which occurred between December 9, 2008 and December 11, 2008 was suspicious: Hours after management allegedly received an email indicating that Kasten had inquired about class action suits regarding time clock punches, Kasten was terminated. That same day, the time clocks were moved closer to the donning and doffing area. He further suggests that others similarly situated to him that had not lodged complaints—that is, other employees who had missed punches—were treated differently. Finally, he argues that Saint-Gobain offered pretextual reasons for his termination.[2]

Kasten has raised a genuine dispute of material fact as to causation under the direct method of proof. He has

---

[2] It is not clear whether Kasten advances this pretext argument in the context of the direct method of proof (proffering it as circumstantial evidence) or the indirect method of proof (as part of a burden-shifting analysis). Presumably for this reason, Saint-Gobain argues that Kasten has abandoned the indirect method of proof argument on appeal, effectively waiving the issue. However, we have recognized that circumstantial evidence of pretext offered as part of a direct method claim "bears an eerie similarity to the evidence required under the indirect method." *Volovsek*, 344 F.3d at 690. This notion, coupled with Kasten's argument that he can succeed under the indirect method of proof (Appellant's Br. 17), suggest that he has not waived this argument. Nevertheless, because Kasten has raised a material factual dispute under the direct method, we do not analyze his claims under the indirect method of proof.

presented several varieties of circumstantial evidence which create a permissible jury inference of retaliation: suspicious timing, ambiguous statements and behavior, and evidence of pretextual reasoning for his discharge. *See Volovsek*, 344 F.3d at 689-90. First, Kasten presents considerable evidence of suspicious timing permitting an inference of retaliatory motive: Kasten asked his Shift Supervisor about class action lawsuits regarding time clock punches on a Saturday (December 9, 2006) and the Shift Supervisor relayed this inquiry in an email to a Human Resources Manager that same day. Two days later (December 11, 2006), the Human Resources Manager forwarded the email to the Operations Manager and Plant Manager, both of whom Kasten alleges participated in the decision to terminate him. Just a few hours later that day, Kasten was terminated. Such timing lends itself to an inference of causation. *See Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("[When] an adverse employment action follows close on the heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied.").

Saint-Gobain argues that Kasten's claim of suspicious timing is undermined by the fact that he received discipline relating to clock punch violations both before and after he engaged in protected activity. However, Kasten alleges that after he lodged complaints with his supervisors and management, Saint-Gobain reprimanded him more often and more severely for infractions. Specifically, he alleges that prior to September 2006,

Saint-Gobain had permitted Kasten to miss multiple time clock punches before disciplining him and permitted him to apply "personal time" in lieu of disciplinary action. After he lodged complaints, however, Kasten alleges that he was disciplined *every* time he missed a punch or punched in late and was not permitted to apply personal time. Based on this record, a reasonable juror could infer that the heightened severity of discipline imposed upon Kasten constitutes evidence of suspicious timing.

We have explained that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644 (citations omitted). However, in addition to evidence of suspicious timing, Kasten has also presented evidence of ambiguous statements. Kasten alleges that immediately before his suspension meeting with management, his supervisor told him to "just lay down and tell them what they want to hear, [they] can probably save your job." Both the district court and Saint-Gobain describe this statement as "too vague" to support a conclusion that Saint-Gobain terminated Kasten because of his protected activity. But ambiguous statements are of course by their nature vague; whether this statement was simply benign encouragement to "say something positive" at the meeting, as Saint-Gobain suggests, or was instead a warning that Kasten was at risk of termination if he didn't cease his protected complaints is an appropriate

question for a jury. Further, the fact that Saint-Gobain changed the location of the clocks the very day that Kasten was terminated serves as an example of suspicious behavior, another variety of circumstantial evidence which may permit a reasonable juror to infer retaliation. *See Volovsek*, 344 F.3d at 689. While Saint-Gobain argues that the decision to move the clocks was made months before and was wholly unrelated to Kasten's complaints, this dispute concerns Saint-Gobain's motive; "summary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) (citation omitted).

Further, Kasten has presented evidence that Saint-Gobain offered pretextual reasons for his discharge. Specifically, Kasten alleges that while Saint-Gobain initially relied on the Attendance Policy as providing the justification for his termination (in its position statement to the Wisconsin Equal Rights Division), Saint-Gobain later abandoned this position upon learning that the policy disavowed termination for so few time clock violations. Saint-Gobain subsequently claimed that the Corrective Action Policy justified Kasten's termination. Kasten argues that such "inconsistency is suggestive of pretext." *Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007). In *Simple*, we held that an employer's inconsistent explanations for taking an adverse employment action was suggestive of pretext, which, when supported by other evidence of improper motive, was

sufficient to defeat a summary judgment motion in the employer's favor. *Id.*[3]

In response to these allegations, Saint-Gobain argues that this court is not charged with adjudicating the application of an employer's personnel policies. *See Appelbaum v. Milwaukee Metro. Sewerage Dis.*, 340 F.3d 573, 579 (7th Cir. 2003) ("We are not, after all, a super-personnel department that sits in judgment of the wisdom of an employer's employment decisions."). However, without commenting on the wisdom of Saint-Gobain's policies, we may recognize that throughout the course of its dealings with Kasten, Saint-Gobain changed its purported rationale for his termination. Indeed, Saint-Gobain acknowledges as much, though attributes the shift in its stance to a "labeling error" in its letter to the Equal Rights Division rather than an effort to "hide the truth."

The facts surrounding the shifting explanations for termination, as alleged by Kasten, are the following: Saint-Gobain represented to the state of Wisconsin that it had terminated Kasten pursuant to its Attendance

---

[3] We made these observations in *Simple* in the context of an argument under the indirect method of proof. *See* 511 F.3d at 671. However, as previously mentioned, circumstantial evidence under the direct method "bears an eerie similarity" to evidence of pretext in the context of the indirect method. *Volovsek*, 344 F.3d at 690. Thus, the reasoning of *Simple* lends support to a finding that Kasten has established a genuine dispute regarding pretextual reasoning on the part of Saint-Gobain under the direct method of proof.

Policy. However, the letter in which Saint-Gobain referred to this rationale did not merely *label* the policy under which Kasten was terminated, but actually explained its reasoning: "disciplinary actions for time clock violations, tardiness, and absenteeism are all governed by the *attendance policy*." (emphasis added). Once Kasten pointed out in his rebuttal statement to the Wisconsin Equal Rights Division that termination under the Attendance Policy was improper and the Division issued a finding of probable cause that Kasten was terminated in retaliation for his protected complaints, Saint-Gobain shifted its position, claiming that Kasten was terminated under the Corrective Action Program.

Such apparent inconsistency is suggestive of pretext. As in *Simple*, Saint-Gobain's inconsistent explanations reinforce other evidence of a retaliatory motive for Kasten's discharge and accordingly permit Kasten to withstand a summary judgment motion. 511 F.3d at 671. Because Kasten has produced evidence of suspicious timing, ambiguous statements and behaviors, and pretext from which a jury could permissibly infer that Saint-Gobain retaliated against him for engaging in protected activity, he has raised a genuine dispute of material fact as to causation. We reverse the grant of summary judgment in Saint-Gobain's favor.

### B. Kasten's oral complaints put Saint-Gobain on "fair notice" that that he was invoking rights under the FLSA

Saint-Gobain argues that in the alternative, we may affirm summary judgment on the basis that Kasten

did not engage in any protected activity and accordingly has not established a prima facie case of retaliation. The Supreme Court explained that oral complaints only constitute protected activity where such complaints provide the employer with "fair notice" that the employee is invoking rights under the FLSA. *Kasten*, 131 S. Ct. at 1334 ("[T]he phrase 'filed any complaint' contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns."). Specifically, "[t]o fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.* at 1335. This standard is an "objective" one. *See id.* Thus, for Kasten to prevail in establishing that his activity was protected, Saint-Gobain need not *actually* have known that Kasten was asserting rights under the FLSA, so long as a reasonable employer in Saint-Gobain's circumstances and armed with its knowledge of the relevant context would have had fair notice of his assertion of rights protected by the FLSA.

The district court correctly determined that at the summary judgment stage, Kasten is entitled to a finding that Saint-Gobain had fair notice of Kasten's assertion of rights. Kasten alleges that he complained about the location of the time clocks on at least five separate occasions and that he notified his supervisors that

he was contemplating bringing a lawsuit which he thought Saint-Gobain would lose. *See EEOC v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir. 1992) (finding protected activity where an employee alleged that employer was "breaking some sort of law"). Such allegations must be credited at this stage. Further, during this time period Saint-Gobain's management was discussing the legality of the time clock location and acknowledged in emails that it might need to move them to insure compliance with wage and hour laws and compensate employees for time spent donning and doffing. In light of these facts, which must be viewed in the light most favorable to Kasten at the summary judgment stage, we conclude that a reasonable employer in Saint-Gobain's position would have received fair notice that Kasten was asserting rights under the FLSA. Accordingly, Kasten engaged in protected activity for purposes of his retaliation claim. We decline Saint Gobain's invitation to affirm summary judgment on these grounds.

## IV. Conclusion

For the foregoing reasons, we REVERSE the grant of summary judgment in Saint-Gobain's favor and REMAND for further proceedings.